UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LARYSSA RICE, individually, and as
Personal Representative for the Estate
of Travis Rice, deceased,

                      Plaintiff,

v.                                Case No. 3:20-cv-1206-BJD-PDB

FLORIDA DEPARTMENT OF
CORRECTIONS et al.,

                      Defendants.

_____

## ORDER

### I. Status

Plaintiff, Laryssa Rice, is proceeding on a complaint under 42 U.S.C. § 1983 and the Florida Wrongful Death Act (FWDA) to recover damages for the death of her son, Travis Rice, who died in the custody of the Florida Department of Corrections (FDOC) (Doc. 6; Compl.).[1] Plaintiff is Travis's mother and Personal Representative of his Estate. *See* Compl. ¶¶ 2, 4. She sues the FDOC and seven corrections officers who were employed by Hamilton Correctional Institution (HCI) at the relevant times. *Id.* ¶¶ 5, 8-14. Plaintiff

---

[1] Plaintiff initiated the action in state court, and Defendants Creamer, Miller, Hancock, and Yetton removed it. *See* Notice of Removal (Doc. 1). The FDOC filed an answer in this Court the next day. *See* FDOC Answer (Doc. 7).

alleges her son Travis "was strangled to death by correctional officers during his incarceration [at HCI] on September 4, 2018." *Id.* ¶ 19. As relevant here, Plaintiff alleges Defendant Johnson improperly used a "chokehold" on Travis, and other officers participated in the alleged use of excessive force by spraying Travis with chemical agents, helping to physically restrain him, or failing to intervene. Count I is an excessive force claim under § 1983 against the individual Defendants. *Id.* ¶¶ 44-55. Count II is a state-law wrongful death (negligence) claim against the FDOC. *Id.* ¶¶ 56-59.

Before the Court is the FDOC's motion for summary judgment (Doc. 80; FDOC Mot.).[2] Plaintiff opposes the motion (Doc. 91; Pl. Resp.) with exhibits (Docs. 90-1 through 90-27). The FDOC filed a reply (Doc. 93; FDOC Reply).

---

[2] The FDOC's exhibits are filed in multiple docket entries (Docs. 80-1, 80-2, 82-1 through 82-9, 83-1, 84-1, 85-1, 86-1). The last four are the transcript of Defendant Johnson's deposition (Docs. 83-1 through 86-1). Although the FDOC provides numerous exhibits, including video footage filed under seal, it relies primarily on the two exhibits filed in the same entry as its motion— affidavits executed by the FDOC's Bureau Chief of Professional Development and Training, John H. DeBell (Doc. 80-2; DeBell Aff.) and its expert witness, Roy R. Bedard (Doc. 80-1; Bedard Aff).The other exhibits are offered primarily to recount the facts, many of which are undisputed and not material to the issues raised in the motion. Plaintiff's exhibits will be cited as "Pl. Ex." followed by the exhibit number (1 through 27). Page numbers cited are those assigned by the Court's electronic management system.

## II. Motion for Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

3

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. *Id.* Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Arguments, Analysis, and Evidence

The FDOC moves for summary judgment on the following grounds: (a) by failing to allege that Travis was survived by his father in addition to herself, Plaintiff has not complied with the FWDA, and she is now time-barred from doing so; and (b) sovereign immunity shields it from liability. *See* FDOC Mot. at 10, 11, 15. In response, Plaintiff argues as follows: (a) the FDOC cites no binding authority "that supports dismissing a wrongful death claim [simply] because . . . the Complaint does not list the correct beneficiaries"; and (b) sovereign immunity does not bar the claim as a matter of law. *See* Pl. Resp. at 11, 17.

4

### A. The FWDA Argument

The parties agree that the FWDA applies. *See* FDOC Mot. at 10; Pl. Resp. at 11. The FWDA provides in pertinent part, "All potential beneficiaries of a recovery for wrongful death, including the decedent's estate, shall be identified in the complaint, and their relationships to the decedent shall be alleged." Fla. Stat. § 768.21. In her complaint, Plaintiff alleges she is "the surviving natural parent" of Travis Rice and, in that capacity, seeks to recover damages available under the FWDA. *See* Compl. ¶¶ 4, 59. She explicitly contends she is the "only survivor of [Travis Rice] under [the FWDA]." *Id.* ¶ 4.

The FDOC contends that it discovered after Plaintiff initiated this case that Travis also was survived by his father, who is not mentioned in the complaint and whom Plaintiff did not notify about this lawsuit. *See* FDOC Mot. at 10. At her deposition, Plaintiff testified that Travis's father's name is Kerry Rice, and she did not inform him about this lawsuit. *See* Pl. Ex. 1 at 62-63.

For Plaintiff's admitted failure to name Travis's father as a survivor in the complaint, the FDOC seeks dismissal of the claim against it. *See* FDOC Mot. at 10. But the FDOC cites no binding authority in support of the relief it seeks. *See id.*; Reply at 3-4. In a footnote, the FDOC cites two district court orders in apparent support of the following proposition: "Plaintiff's compliance with all statutory condition precedents [sic] is mandated and her failure to do

5

so within the statute of limitations warrants summary judgment in favor of the FDOC." *See* FDOC Mot. at 10 n.25. (citing *Woody v. Delray Med. Ctr.*, No. 9:15-cv-81162, 2016 WL 705965, at *3 (S.D. Fla. Feb. 23, 2016); *Mangin v. Robertson*, No. 6:07-cv-1649-ORL-18KRS, 2008 WL 2522576, at *2 (M.D. Fla. June 24, 2008)).

Neither *Woody* nor *Mangin* stands for the proposition the FDOC advances. Rather, those orders explain the consequences for a plaintiff's failure to comply with the "complex" and "stringent" conditions precedent to bringing a medical malpractice claim in Florida. *See Woody*, 2016 WL 705965, at *3 (dismissing with prejudice the plaintiff's medical malpractice claims for her failure to timely comply with the "[s]tringent presuit investigatory requirements"); *Mangin*, 2008 WL 2522576, at *2 (explaining that the "presuit requirements are a condition precedent to filing a medical malpractice" claim under Chapter 766).

Florida's "uncommonly complex" and stringent medical malpractice statute expressly mandates dismissal of a claim for a plaintiff's failure to comply with the presuit requirements. *See* Fla. Stat. § 766.206(2). The FWDA contemplates no such sanction for a plaintiff's failure to list all survivors in a complaint, *see generally* Fla. Stat. § 768.21, and the FDOC cites no binding authority suggesting a plaintiff's failure to do so is akin to a failure to satisfy

6

the stringent presuit requirements set forth in Chapter 766 of the Florida Statutes, *see* FDOC Mot. at 10; FDOC Reply at 3, 4 n.14. Indeed, one of the district court orders the FDOC cites in its reply suggests the proper remedy for a pleading deficiency of this kind would be to permit an amendment. *See Skyles v. McCoy*, No. 6:16-cv-1968-ORL-37TBS, 2017 WL 1322071, at *4 (M.D. Fla. Apr. 7, 2017) (granting the plaintiff leave to amend to comply with the FWDA's requirement to identify all potential beneficiaries). Accordingly, the FDOC's motion is due to be denied on this argument.

### B. The Sovereign Immunity Argument

The FDOC invokes sovereign immunity on two grounds: (i) Plaintiff seeks to hold the FDOC vicariously liable for the corrections officers' actions, which she alleges were malicious, sadistic, or intentional; and (ii) Plaintiff alleges the violation of discretionary as opposed to operational functions, or points to no evidence substantiating her allegations. *See* FDOC Mot. at 11, 15, 17-18. In opposition, Plaintiff argues (i) she proceeds against the FDOC and the individual officers on alternative theories of liability and whether the officers "acted with sufficient malice to preclude a claim against the state" is a jury question, and (ii) she challenges operational, as opposed to discretionary, functions. *See* Pl. Resp. at 12-13, 19.

### i. Florida's Waiver of Sovereign Immunity for Tortious Conduct

First, the FDOC argues sovereign immunity bars the negligence claim against it because Plaintiff proceeds on a theory of vicarious liability for the officers' "intentional" conduct (excessive force) but, under Florida law, "there is no such thing as the 'negligent' commission of an 'intentional' tort." *See* FDOC Mot. at 11, 13-14 (quoting *Greer v. Ivey*, 767 F. App'x 706, 713 (11th Cir. 2019)).

As provided under the Florida Statutes, the state is deemed to have waived its sovereign immunity for acts of its employees who, acting in the scope of their employment, cause injury or death to another through negligence or wrongful acts or omissions. Fla. Stat. § 768.28(1). However, the state has not waived its sovereign immunity for acts of its employees that were "committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.* § 768.28(9)(a). Under the relevant provision,

> [t]he state or its subdivisions are not liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or [1] committed in bad faith [2] or with malicious purpose [3] or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

*Id.*

8

The phrases "bad faith," "malicious purpose," and "wanton and willful disregard of human rights [or] safety" are not defined in the statute, but Florida courts have provided guidance:

> The phrase "bad faith" . . . has been equated with the actual malice standard.

> The phrase "malicious purpose" . . . has been interpreted as meaning conduct was committed with "ill will, hatred, spite, [or] an evil intent." … [S]tated more simply, "the subjective intent to do wrong.

> The phrase "wanton and willful disregard of human rights [or] safety" . . . has been interpreted as "conduct much more reprehensible and unacceptable than mere intentional conduct," and "conduct that is worse than gross negligence."

*Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020) (internal citations omitted). Florida's standard jury instructions define the terms "wanton" and "willful." The former term refers to a state of mind that is "intentional[], knowing[], and purposeful[]," while the latter term requires something more: "a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons." *Id.* at 110. *See also Williams v. City of Minneola*, 619 So. 2d 983, 987 (Fla. 5th DCA 1993) (holding a finding of recklessness also could support a finding of "willful and wanton conduct under section 768.28(9)"). The standard to overcome Florida's sovereign immunity "is at least as high as the standard needed to prove" an

officer or agent of the state was deliberately indifferent to an inmate's health or safety under § 1983. *See Valdes v. Crosby*, 390 F. Supp. 2d 1084, 1108 (M.D. Fla. 2005), *aff'd*, 450 F.3d 1231 (11th Cir. 2006).

Whether an officer's conduct "evinced bad faith, malicious purpose, or wanton [and] willful disregard" for an inmate's safety is highly fact-specific inquiry, generally preventing courts from concluding as a matter of law on summary judgment that sovereign immunity applies. *See Butler v. Gualtieri*, 41 F.4th 1329, 1337-38 (11th Cir. 2022) (affirming the denial of sovereign immunity for the sheriff where there were "material factual disputes" about what happened and the inferences to be drawn therefrom, including "the nature and degree of [the arrestee's] resistance" and whether the officer used more force than was necessary under the circumstances); *Thompson v. Douds*, 852 So. 2d 299, 306, 309 (Fla. 4th DCA 2003) (holding the trial court erred in granting summary judgment in favor of officers who, the court held as a matter of law, used more force than was necessary to subdue a suspect, because there remained genuine issues of material fact whether the officers acted with "wanton and willful disregard of [the suspect's] rights [or] safety").

Under Florida's sovereign immunity statute, tort claims against a state agency and its employee for the same conduct are mutually exclusive: "In any given situation[,] either the agency can be held liable . . . or the employee [can

be held liable], but not both." *McGhee v. Volusia Cnty.*, 679 So. 2d 729, 733 (Fla. 1996). Although the agency and employee cannot both be held liable under section 768.28, a plaintiff may plead her claims in the alternative. *See* Fed. R. Civ. P. 8(d)(2); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277-78 (11th Cir. 2006). "When a plaintiff pleads claims in the alternative . . . they are [to be] read separately." *Strong v. City of Naples*, No. 2:22-cv-318-KCD, 2022 WL 14029702, at *2 (M.D. Fla. Oct. 24, 2022) (citing *Wagner*, 464 F.3d at 1278).

In Count II, Plaintiff alleges the FDOC breached its duty to Travis by, among other things, failing to abide by applicable rules, failing to properly train and supervise HCI officers "regarding the safe and proper use of force against inmates," and failing to implement policies "regarding the safe and proper methods of a correctional officer's use of force against inmates." *See* Compl. ¶ 58. Plaintiff's negligence claim against the FDOC is based on the officers' alleged use of excessive force as pleaded in Count I. But Plaintiff's claim against the officers in Count I is not, by definition, an "intentional tort"; she pursues a claim for excessive force under § 1983. And force that is deemed excessive under § 1983 is not necessarily synonymous with force that is done with "bad faith, malicious purpose, or wanton [and] willful disregard of human rights [or] safety" as those terms are used in section 768.28(9)(a). *See Butler*, 41 F.4th at 1339-40 (citing *Thompson*, 852 So. 2d at 310). *Cf. City of Miami v.*

11

*Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (explaining that, under Florida law, there is no such thing as a claim for negligent use of excessive force because "a suit for a police officer's use of excessive force necessarily involves the intentional tort of battery").

Moreover, although Plaintiff alleges in Count I that the officers acted "maliciously, sadistically, and deliberately," *see* Compl. ¶¶ 48, 51, she does not incorporate those allegations into her claim against the FDOC. *Id.* ¶ 56. As such, the claims alleged in Counts I and II are not internally inconsistent or factually incongruent. In other words, the Court cannot conclude as a matter of law that Plaintiff's alternative claims against the officers and the FDOC may not both proceed to a jury. "It remains possible that [the officers] acted wrongfully [or negligently] but without bad faith, malice, or w[a]nton and willful disregard." *See Strong*, 2022 WL 14029702 at *2. Whether the officers acted with sufficient intent to absolve the FDOC of liability for their conduct is a question of fact for the jury. *See id.* As such, the FDOC is not entitled to summary judgment on this argument.

### ii.  Florida's Immunity from Tort Liability for Discretionary Functions

Next, the FDOC contends that Plaintiff complains solely about functions that are discretionary in nature and to which immunity attaches. *See* FDOC Mot. at 15. A state agency is immune from suit for acts that are purely

"discretionary in nature," as opposed to "merely operational." *See Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) (internal quotation marks omitted) (citing *Kaisner v. Kolb*, 543 So. 2d 732, 734 (Fla. 1989)). Acts that are "necessary to or inherent in policy or planning" are discretionary in nature, while acts that "merely reflect[] a secondary decision as to how . . . policies or plans will be implemented" are operational in nature. *Id.* at 1264. *See also Trianon Park Condo. Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 918 (Fla. 1985). "[A]n act is 'discretionary' if it involves an exercise of executive or legislative power such that, for the court to intervene by way of tort law would inappropriately entangle it in fundamental questions of policy and planning." *Lewis*, 260 F.3d at 1264-65 (internal quotation marks omitted) (quoting *Dep't of Health & Rehab. Servs. v. Yamuni*, 529 So. 2d 258, 260 (Fla. 1988)).

Plaintiff alleges the FDOC breached its duty under state law to "exercise a reasonable degree of care in the operation and management of [HCI] and to safeguard inmates and protect their constitutional rights." *See* Compl. ¶¶ 57-58. Plaintiff alleges the FDOC breached its duty in the following eight ways:

a) Failing to abide by the [FDOC's] rules, guidelines[,] and regulations;
b) Failing to abide by the American Correctional Association's rules, guidelines, and regulations;
c) Failing to implement and follow proper medical protocols and procedures;

13

d) Failing to implement proper policies and procedures to ensure the safety and wellbeing of [HCI's] inmates, including [Travis];

e) Failing to properly train the [HCI's] correctional officers regarding the safe and proper use of force against inmates, including [Travis];

f) Failing to implement the appropriate policies and procedures, rules and regulations, and guidelines regarding the safe and proper methods of a correctional officer's use of force against inmates, including [Travis];

g) Failing to properly supervise [HCI's] correctional officers; and

h) Failing to prevent the strangulation and death of [Travis].

*Id.* ¶ 58. The FDOC argues Plaintiff challenges discretionary functions, but, regardless, no evidence substantiates her allegations in subparagraphs (a) through (g). *See* FDOC Mot. at 18-25. The FDOC does not address subparagraph (h) in its motion. *See id.* As such, the Court will not do so.

In her response, Plaintiff clarifies that her claim is premised on Defendant Johnson's alleged improper use of a "chokehold." *See* Pl. Resp. at 17. Specifically, Plaintiff argues the evidence shows the FDOC contributed to Travis's death by (1) failing to follow its own policies and rules that prohibited officers from using chokeholds, or (2) failing to properly train Defendant Johnson how to safely use such a technique. *Id.* In so narrowing her claim, she

14

abandons the allegations contained in all subparagraphs except for (a) and (e) (and (h) given the FDOC does not address it, as noted).[3]

Plaintiff says that the issue is not what content should have been included in the FDOC's training program, which she concedes is a discretionary function not subject to suit, but rather the implementation of policies related to training corrections officers. *See* Pl. Resp. at 19-20. Plaintiff contends, "[Defendant] Johnson was trained that an available technique to gain control [of an inmate] was choking [him] to unconsciousness, but that [sic] was also never taught how to do it right." *Id.* at 19. If Plaintiff indeed is challenging the FDOC's implementation of an established policy, then sovereign immunity would not bar the claim. *See Lewis*, 260 F.3d at 1266 (noting that a challenge to the implementation of a police training program as related to specific officers involved in an incident would involve operational

---

[3] The FDOC contends in its reply that Plaintiff does not dispute its argument that there is no evidence supporting the allegations set forth in subparagraphs (b), (c), and (d). *See* Reply at 7. The Court agrees and further finds Plaintiff does not dispute the FDOC's argument with respect to subparagraphs (f) and (g). The FDOC does not reference by letter designation subparagraph (g) in its motion but addresses the allegations in that subparagraph (a failure to supervise) together with the allegations in subparagraph (e) (a failure to train). *See* FDOC Mot. at 23-24. Plaintiff does not argue in her response, or cite to evidence, that the FDOC failed to supervise Defendant Johnson or any other individual Defendant, as alleged in subparagraph (g). *See* Pl. Resp. at 17-20. Her argument is limited to a failure to properly train Defendant Johnson in the use of a specific defensive technique—a chokehold—which implicates subparagraphs (a) and (e).

functions). However, the evidence does not support Plaintiff's characterization of the issue.

The FDOC argues it prohibits the use of "chokeholds" and, therefore, does not train officers on their use, and it was not on notice of a need to train Defendant Johnson or other officers in a particular area. *See* FDOC Mot. at 18-19, 23-24. In so arguing, the FDOC primarily relies on the affidavits of Mr. DeBell and Dr. Bedard. DeBell explains the Criminal Justice Standards and Training Commission (CJSTC) establishes minimum training criteria for law enforcement personnel, including corrections officers. *See* DeBell Aff. ¶ 3. The technique referred to as the standard vascular neck restraint (SVNR)—colloquially, a "chokehold"—is part of the curriculum, but whether corrections agencies must teach it is optional.[4] *Id.* ¶ 4.

DeBell avers the CJSTC uses Form 6 to evaluate a new corrections officer's performance in defensive tactics. *Id.* ¶ 5. Form 6 indicates the SVNR defensive technique is an optional training category. *Id.* With his affidavit, DeBell provides a copy of Defendant Johnson's completed Form 6, which indicates he finished his training on January 12, 2015. *Id.* at 13. Page 4 of the form requires an instructor to indicate whether a candidate was trained in the

---

[4] Plaintiff uses the term "chokehold" when referring to the SVNR technique. *See* Pl. Resp. at 5. However, Dr. Bedard avers the terms refer to different techniques. *See* Bedard Aff. at 15-17.

use of the SVNR, listed as an "optional" category. *Id.* at 16. On Defendant Johnson's form, an instructor wrote "N/A" in the category for instruction on the SVNR. *Id.*

DeBell avers, "candidates for the FDOC are not instructed on nor tested for their proficiency on the proper use of the SVNR" because the FDOC does not permit its officers to use such a technique. *Id.* ¶¶ 6-8. In fact, all defensive tactics instructors are required to sign a form "acknowledging their understanding that the FDOC prohibits any training on the use of the SVNR or any choke hold technique under any circumstances." *Id.* ¶ 9. DeBell provides a copy of this form with his affidavit. *See id.* at 18.

The FDOC also provides the expert report of Dr. Bedard, who avers he has been "listed as a subject matter expert in use of force and defensive tactics by the Florida Department of Law Enforcement [(FDLE), which] oversees the [CJSTC]." *See* Bedard Aff. at 3. In forming his opinion, Dr. Bedard reviewed, among other things, documentary and video evidence of the subject incident. *Id.* at 7-11. Dr. Bedard explains various reports indicate that, at shortly after 10:00 p.m., officers observed Travis being combative (in their opinion) and non-compliant with commands to submit to restraints.[5] *Id.* at 12-13. Defendant

---

[5] The parties dispute the reason for Travis's admittedly strange behavior. Inmates who witnessed the incident said Travis was having a spiritual battle or a mental breakdown and had tried to declare a medical emergency earlier

Johnson deployed chemical agents and, when that did not have the desired effect, "grabbed [Travis] by the shoulder and initiated a foot sweep to bring him to the ground" face first. *Id.* at 13.

Dr. Bedard explains that other officers then assisted: "Several officers stabilized [Travis] with downward pressure to his torso and limbs, then with the use of handcuffs (Hardee and McCoy) and leg restraints (Hancock and Creamer) secured him." *Id.* The incident was captured on video, which Dr. Bedard reviewed. He avers the video shows the following:

> [Defendant] Johnson on top of [Travis] at approximately 10:23:52. Johnson's arm is placed around [Travis]'s upper body or neck, but the video is not clear if there is any neck compression. Johnson claimed that he placed his arm over [Travis]'s arms to give the officers the ability to handcuff him. All that can be seen is Johnson's shoulder on the shoulder of Travis. The placement of the forearm remains hidden from view. At no time was I able to see the placement of Johnson's arm against the windpipe of Travis.
>
> ....
>
> At 10:24:44, Johnson released [Travis] and stood up. At this time another officer moved to a prone handcuff position and handcuffed [Travis]. He placed his support knee on the ground and not on [Travis]'s back to not compromise [Travis]'s respiration. [Travis] was secured without further incident. Only 52 seconds

---

in the evening. *See* Pl. Ex. 16 at 7; Pl. Ex. 17 at 7; Pl. Ex. 21. The individual Defendants and at least one inmate believed Travis had ingested a form of synthetic marijuana known in the corrections system as K2. *See* Pl. Ex. 16 at 7; Pl. Ex. 21 at 1; Pl. Ex. 22.

> passed from the time Johnson grabbed [Travis] around
> the upper body and neck to the time he released him.
> At 10:25:40, [Travis] was secured, and the officers
> stood him up.[6]

*Id.* at 14-15.

Dr. Bedard avers there is no evidence showing Defendant Johnson was "formally trained in the proper use or application of the SVNR," which, when performed correctly, restricts blood flow and is considered safe for use by corrections officers, as opposed to a chokehold, which restricts airflow and is not safe to use. *Id.* at 15-17. He acknowledges that "neither a properly applied SVNR nor an unorthodox 'chokehold' would [have been] appropriate under the circumstances[,] the first technique by policy and the second by law." *Id.* at 15. He also acknowledges, however, that the evidence does not clearly reflect whether "[Defendant] Johnson applied a vascular restraint [or] a chokehold, or if the technique he applied was proximate to [Travis]'s death." *Id.* at 17, 23.

---

[6] During the use-of-force or shortly thereafter, Travis became unconscious, and officers had to remove him from the dormitory using a "two-man carry." *See* Bedard Aff. at 18; Pl. Ex. 22 at 1. It is undisputed that the use of the "two-man carry" violated FDOC policy. *See* Pl. Ex. 22 at 1 (use of force incident report noting the "two-man carry technique that was used by staff during the removal of [Travis] from the dormitory" did not comply with Florida Administrative Code chapter 33-602.210). Plaintiff clarifies that her claim is not premised on the improper use of the "two-man carry" but rather on Defendant Johnson's alleged use of a chokehold. *See* Pl. Resp. at 17.

Plaintiff counters in her response that the FDOC violated its own policy by "*training* [Defendant] Johnson that a chokehold was a permitted defensive technique." *See* Pl. Resp. at 17, 20 (emphasis added). Plaintiff provides no contemporaneous citation to the record in support of this contention, but it appears she is relying primarily on the following exhibits: 13 (Dr. Bedard's deposition transcript); 14 (a 76-page document that lists all the training courses the individual Defendants took); 15 (a training manual titled, "Florida Basic Recruit Training Program: High Liability, Volume 2"); 16 (a criminal investigation report prepared by the Office of the Inspector General (IG), case number 18-15621); 17 (an administrative investigation case summary report prepared by the IG's office, case number 19-12444); and 23 (Defendant Johnson's Form 6). *See* Pl. Resp. at 7-8, 17.

In the IG report for case number 18-15621, the reporting officer concludes that the video evidence shows Defendant Johnson lying on top of Travis "with his left arm wrapped around [Travis's] throat and neck area, consistent with a technique known as a [SVNR] ('chokehold')." *See* Pl. Ex. 16 at 8. Additionally, the IG notes, "A check of [Defendant] Johnson's FDLE CJSTC Form 6, Defensive Tactics Performance Evaluation from his Basic Recruit Training indicated he was not tested or showed proficiency on the

Case 3:20-cv-01206-BJD-PDB   Document 95   Filed 05/25/23   Page 21 of 25 PageID 4272

proper utilization of the [SVNR]." *Id.*[7] The FDOC concedes Defendant Johnson was not trained how to use a SVNR and explains why: the FDOC explicitly prohibits officers from using such a technique and, therefore the optional lesson in the Florida Basic Recruit Training Program manual (lesson 12) is omitted from the FDOC's training program as a matter of policy. *See* DeBell Aff. ¶¶ 6-9; Bedard Aff. at 15-16; Pl. Ex. 13 at 35-36.

The IG report for case number 19-12444 provides as follows:

> [I]t is apparent from video evidence, and corroborated by multiple inmate witnesses, that [Defendant] Johnson placed [Travis] in what is effectively known as a "choke-hold"; a Defensive Tactic or UOF method that is considered Deadly Force. The application of a deadly force method during this incident was an inappropriate and excessive response to the active resistance displayed by Inmate Rice and should not have been employed.
>
> *Sergeant Johnson was trained in these matters as evidence by his basic recruit training documents, which indicate he showed proficiency.*

*See* Pl. Ex. 17 at 10 (emphasis added).

It is unclear to what training documents the report refers or what is meant by the phrase, "these matters" (i.e., "deadly force" or use-of-force techniques generally or chokeholds specifically). However, this statement does

---

[7] Dr. Bedard too observed at his deposition that Defendant Johnson's Form 6 indicates he had not been trained in the technique. *See* Pl. Ex. 13 at 31-32, 34-35.

not contradict the evidence offered by the FDOC that Defendant Johnson received no training in the use of a SVNR because, as a matter of policy, officers were not permitted to use the technique. *See* DeBell Aff. ¶¶ 6-9; Pl. Ex. 23.

Plaintiff points to no documentation supporting the conclusion she asks the Court to take away from the IG reports and training materials: that the "FDOC violated its own policy by training [Defendant] Johnson that a chokehold was a permitted defensive technique." *See* Pl. Resp. at 17-18. The IG report number 19-12444 does not reference, identify, or incorporate any training materials for Defendant Johnson. *See generally* Pl. Ex. 17. The basic recruit training manual Plaintiff cites (exhibit 15) is the same manual DeBell references in his affidavit, which notes that training in the use of the SVNR is "optional for . . . Corrections." *See* Pl. Ex. 15 at 252. And there is no indication in the seven pages of training records for Defendant Johnson that he was instructed or informed a SVNR was "a permitted defensive technique" to use when dealing with difficult inmates. *See* Pl. Ex. 14 at 1-7. The curriculum for each course is not provided, and the course names are non-descript, i.e., "Defensive Tactics and Use of Force." *See id.* at 4-5.

Although the IG reports note the video of the incident shows Defendant Johnson with his arm around Travis's neck "consistent" with a SVNR or chokehold, this fact, standing alone, does not permit the conclusion or inference

that the FDOC, contrary to its own policy, trained or advised Defendant Johnson the SVNR was a permitted defensive technique. Dr. Bedard explains in his deposition transcript that a person is not using the SVNR just because his arm is around another person's neck: "Placing your hand around someone's neck or your arm around someone's neck does not make it a vascular neck restraint." *See* Pl. Ex. 13 at 32. He notes that, in a physical interaction, a person may grab another person's neck simply out of convenience but not out of training or intent to apply a specific defensive technique. *Id.* at 33-34. If the person does not know about the technique, he or she cannot be said to have used it properly or improperly. *Id.* at 34.

In short, Plaintiff offers no evidence supporting her conclusory assertion that Defendant Johnson was informed, instructed, or advised through his official FDOC training that a SVNR was "a permitted defensive technique" but nonetheless was not trained how to safely use it. Rather, the evidence shows that the FDOC, as a matter of policy, prohibits corrections officers from using the SVNR, does not train its officers in its use for that reason, and requires defensive tactics instructors to sign a waiver certifying their understanding that they are not to teach officers who are not CJSTC-certified instructors how

to use the technique.[8] *See* DeBell Aff. ¶¶ 6-9, p. 18; Pl. Ex. 13 at 35; Pl. Ex. 23. To the extent Plaintiff merely disagrees with the FDOC's policy to omit the SVNR lesson from its training curriculum, her challenge is to a discretionary function and not subject to suit. *See Lewis*, 260 F.3d at 1266 ("A city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning.").

For the reasons stated, the Court finds the FDOC's motion for summary judgment is due to be granted as to the allegations in paragraph 58 subparagraphs (a) through (g). Given the FDOC does not address subparagraph (h) in its motion, those allegations will proceed to trial.

Accordingly, it is now

**ORDERED:**

1.    The FDOC's motion for summary judgment (Doc. 80) is **GRANTED in part** to the extent stated in this Order.

2.    The Court encourages the parties to renew or continue their settlement discussions and advise the Court immediately if their discussions are fruitful.

---

[8] Plaintiff does not assert or point to evidence that Defendant Johnson was a CJSTC-certified instructor.

**DONE AND ORDERED** at Jacksonville, Florida, this 25th day of May

2023.

_____

BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Counsel of Record